UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

SECURITIES INVESTOR PROTECTION CORPORATION,

Plaintiff,

v.

BERNARD L. MADOFF INVESTMENT SECURITIES LLC,

Defendant.

-----------------------------------------------------------X

Adv. Pro. No. 08-01789 (BRL)

SIPA Liquidation

(Substantively Consolidated)

IN RE:

BERNARD L. MADOFF,

Debtor.

-----------------------------------------------------------X

IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,

Plaintiff,

v.

THE LDP CORP. PROFIT SHARING PLAN AND TRUST; LEONARD D. PEARLMAN, in his capacity as Trustee for The LDP Corp. Profit Sharing Plan and Trust; and EMANUEL R. PEARLMAN, in his capacity as Trustee for The LDP Corp. Profit Sharing Plan and Trust,

Defendants,

-----------------------------------------------------------X

Adv. Pro. No. 10-05043 (BRL)

# MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS TO WITHDRAW THE REFERENCE PURSUANT TO 28 U.S.C. § 157 (d)

JASPAN SCHLESINGER LLP
*Attorneys for Defendants*
300 Garden City Plaza
Garden City, New York 11530
Telephone: (516) 746-8000
Fax: (516) 393-8282

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................iii

PRELIMINARY STATEMENT ....................1

BACKGROUND AND PROCEDURAL HISTORY ....................2

A. The Appointment of the Trustee ....................2

B. The Adversary Proceeding ....................2

ARGUMENT

POINT I
WITHDRAWAL OF THE REFERENCE IS MANDATORY WHERE SUBSTANTIAL CONSIDERATION IS REQUIRED OF BOTH THE BANKRUPTCY CODE AND OTHER FEDERAL LAWS ....................3

POINT II
SIPA AND OTHER SECURITIES LAWS ALTER THE STANDARD THE TRUSTEE MUST MEET IN ORDER TO SHOW CAUSE THAT A DEFENDANT DID NOT RECEIVE TRANSFERS IN GOOD FAITH UNDER 11 U.S.C. 548 (C) ....................7

POINT III
WHETHER TRANSFERS MAY BE AVOIDED THAT SATISFIED ANTECEDENT DEBTS REQUIRES SIGNIFICANT INTERPRETATION OF SECURITIES LAWS ....................9

A. Brokerage Statements Create Enforceable Obligations ....................9

B. The Trustee Cannot Avoid Payments in Satisfaction of an Antecedent Debt ....................11

POINT IV
RESOLVING THE ISSUE OF WHETHER SECTION 546(e) OF THE BANKRUPTCY CODE APPLIES REQUIRES SUBSTANTIAL AND MATERIAL CONSIDERATION OF NON-BANKRUPTCY LAW MANDATING WITHDRAWAL OF THE REFERENCE ....................13

POINT V
PROVISIONS OF THE INTERNAL REVENUE CODE EFFECTIVELY REQUIRE WITHDRAWALS FROM PENSION PLANS AND THEREFORE PREVENT THE TRUSTEE FROM AVOIDING THE REQUIRED WITHDRAWALS AS FRAUDULENT ....................15

POINT VI
POST STERN, BANKRUPTCY COURTS CANNOT ENTER A FINAL JUDGMENT WITHOUT USURPING THE JUDICIAL POWER RESERVED FOR ARTICLE III COURTS WHICH RAISES SERIOUS CONSTITUTIONAL ISSUES ..... 16

POINT VII
THIS ACTION IS SUBJECT TO WITHDRAWAL OF THE REFERENCE FOR CAUSE ..... 18

A. Defendants Have a Right to a Jury Trial on All of the Claims in the Complaint ..... 19

B. Judicial Economy and Uniformity Require Withdrawal of the Reference ..... 19

CONCLUSION ..... 22

# TABLE OF AUTHORITIES

***Federal Cases***


Atlanta Shipping Corp. v. Chemical Bank,
818 F.2d 240, 249 (2d Cir. 1987) ........ 12

Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.),
323 B.R. 838, 842 (Bankr. S.D.N.Y. 2005) ........ 12

Granfinanciera, S.A. v. Nordberg,
492 U.S. 33, 50, 109 S. Ct. 2782, 2794, 106 L. Ed. 2d 26 (1989) ........ 5, 16, 17

In re Bernard L. Madoff Investment Securities, 654 F.3d 229, 235 (2d Cir. 2011) ........ 6

In re Cablevision S.A., 315 B.R. 818, 821 (S.D.N.Y. 2004) ........ 5, 6

In re Chateaugay Corp., 86 B.R. 33, 36-39 (S.D.N.Y. 1987) ........ 4

In re Enron Corp., 388 B.R. 131, 140 (S.D.N.Y. 2008) ........ 5

In re Enron Creditors Recovery Corp., 651 F.3d 329, 334 (2d Cir. June 28, 2011) ........ 14

In re J.P. Jeanneret Assocs., 769 F. Supp. 2d 340, 363 (S.D.N.Y. Jan. 31, 2011) ........ 10

In re Wedtech Corp., 94 B.R. 293, 296 (S.D.N.Y 1988) ........ 18

Keller v. Blinder (In re Blinder, Robinson & Co.), 135 B.R. 892, 896 (D. Colo. 1991) ........ 12

Nathel v. Siegal, 592 F. Supp. 2d 452, 463 (S.D.N.Y. 2008) ........ 10

N. Pipeline Const. Co. v. Marathon Pipe Line Co.,
458 U.S. 50, 71, 102 S. Ct. 2858, 2871, 73 L. Ed. 2d 598 (1982) ........ 5, 16

Northwest Airlines, Inc. v. Los Angeles
(In re Northwest Airlines Corp.), 384 B.R. 51 (S.D.N.Y. 2008) ........ 18

Orion Pictures Corp. v. Showtime Networks, Inc.
(In re Orion Pictures Corp.), 4 F.3d 1095, 1101 (2d Cir. 1993) ........ 18, 19

Pereira v. Equitable Life Ins. Soc'y of the United States2
(In re Trace Int'l Holdings, Inc.), 289 B.R. 548, 557 (Bankr. S.D.N.Y. 2003) ........ 14

Picard v. Katz, et al., 462 B.R. 447 (S.D.N.Y. 2011) ........ 6, 43

Picard vs. HSBC Bank PLC, 450 B.R. 406, 409 (S.D.N.Y. 2011) ........ 4, 7

Pryor v. Fisher (In re Dimino), 429 B.R. 408, 417 (Bankr. E.D.N.Y. 2010) .............................. 12

S.E.C. v. Zandford, 535 U.S. 813, 814, 122 S. Ct. 1899, 1900, 153 L. Ed. 2d 1 (2002)............. 10

Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
454 B.R. 307, 316 (S.D.N.Y. 2011).......................................................................... 4

Sharp Int'l Corp. v. State St. Bank & Trust Co.
(In re Sharp Int'l Corp.), 403 F.3d 43, 54 (2d Cir. 2005)................................................... 9, 11

Shugrue vs. Air Line Pilots Ass'n, Int'l
(In re Ionosphere Clubs, Inc), 922 F.2d 984, 995 (2d Cir. 1990) ......................................... 4, 6

Stern v. Marshall, 131 S. Ct. 2594, 2614, 180 L. Ed. 2d 475 (2011) reh'g denied, 132 S. Ct. 56,
180 L. Ed. 2d 924 (U.S. 2011)................................................................ 5, 15, 16, 17, 19

***Federal Statutes***

11 U.S. C. § 548(a)(1)(A) ........................................................................................... 11

11 U.S.C § 546(e) ............................................................................................... 13, 14

11 U.S.C. § 544(b) .................................................................................................... 9

11 U.S.C. § 548.............................................................................................................. 7, 8

11 U.S.C. § 548(a)(1)................................................................................................... 7

11 U.S.C. § 548(c) .................................................................................................... 9, 10

11 U.S.C. 548(c) ........................................................................................................ 10

15 U.S.C. § 78aaa ........................................................................................................ 4

15 U.S.C. § 78fff-1(a)................................................................................................... 14

15 U.S.C. §§ 78aaa ........................................................................................................ 1

28 U.S.C. § 157(b)(2)(H)............................................................................................... 17

28 U.S.C. § 1334............................................................................................................ 5

28 U.S.C. § 157(a) .......................................................................................................... 5

28 U.S.C. § 157(b)(2) ..................................................................................................... 15

28 U.S.C. § 157(d)........................................................................................ 1, 3, 4, 5, 6, 18

***State Statutes***

N.Y. C.P.L.R. § 213(8) (McKinney's 2012) ........ 7

N.Y. Debt & Cred. Law § 272 (McKinney's 2012) ........ 9, 12

N.Y. Debt. & Cred. Law § 276 (McKinney's 2012) ........ 9

NYUCC § 8-501(b). Section 8-501(c) ........ 11

NYUCC Art. 8 ........ 10

***Federal Regulations***

17 C.F.R. § 240.10b-10 ........ 10

17 C.F.R. § 240.17a-4(b)(4) ........ 10

17 C.F.R. § 240.17a-4(c) ........ 10

## PRELIMINARY STATEMENT

Defendants The LDP Corp. Profit Sharing Plan And Trust; Leonard D. Pearlman, in his capacity As Trustee for The LDP Corp. Profit Sharing Plan and Trust; and Emanuel R. Pearlman, in his capacity as Trustee for The LDP Corp. Profit Sharing Plan and Trust (collectively, the "Defendants"), by their attorneys Jaspan Schlesinger, LLP, respectfully submit this memorandum of law in support of their motion (the "Withdrawal Motion"), pursuant to 28 U.S.C. §§ 157(d), to withdraw the reference to the United States Bankruptcy Court (the "Bankruptcy Court") of the above-captioned adversary proceeding (the "Adversary Proceeding") brought by plaintiff Irving Picard, the Trustee ( "Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS").

Section 157(d) mandates withdrawal of the reference where there is an issue involving the Title 11 of the United States Code (the "Bankruptcy Code") and other federal law that requires substantial consideration of such other federal law. Significant and novel questions of non-bankruptcy federal law permeate this case and mandate withdrawal of the reference.

The Madoff fraud arises in a context unusual even for Ponzi scheme cases, because the alleged Ponzi scheme was perpetrated by a registered broker. Consequently, and of critical importance for this motion to withdraw the reference, the liquidation of Madoff Securities is governed by the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, et seq., ("SIPA") and Picard's avoidance claims raise significant questions regarding the interpretation of SIPA and its interaction with other federal securities laws and the Bankruptcy Code. SIPA does not support Picard's unprecedented contention that SIPA requires that he avoid transfers to customers that are protected payments under the securities laws and would not otherwise be avoidable under the Bankruptcy Code.

SXS/D809074v1/M057492/C0153850

Additional factors weigh in favor of withdrawal of the reference of this Adversary Proceeding. Those include judicial economy, expediting the bankruptcy process, ensuring uniformity of bankruptcy administration, and satisfying the parties' jury demands.

## BACKGROUND AND PROCEDURAL HISTORY

### A. The Appointment of the Trustee

On December 11, 2008, Madoff's fraud was exposed and BLMIS customers discovered that the BLMIS brokerage account statements they received were fraudulent. The U.S. Attorney for the Southern District of New York charged him with conducting a multi-billion-dollar securities fraud. On December 15, 2008, following Madoff's admission that he had been operating a Ponzi scheme through BLMIS, this Court granted the Securities Investor Protection Corporation's application to appoint Irving H. Picard as trustee of BLMIS pursuant to SIPA, and referred the BLMIS SIPA liquidation proceeding to the Bankruptcy Court for the Southern District of New York, where it was assigned to Bankruptcy Judge Burton R. Lifland.

Since December 15, 2008, the Trustee has filed approximately 1,000 adversary proceedings, primarily to recover funds transferred from BLMIS under the avoidance and recovery sections of Chapter 5 of the Bankruptcy Code and the fraudulent conveyance provisions of the New York Debtor and Creditor Law. The Defendants discovered that they had lost approximately millions of dollars as a result of Madoff's fraud.

### B. The Adversary Proceeding

On December 2, 2010, the Plaintiff commenced this adversary proceeding (the "Adversary Proceeding") by the filing of a complaint (the "Complaint") against the Defendants.

The Trustee's Complaint seeks to avoid, as fraudulent transfers, all transfers of principal and withdrawals by the Defendants from BLMIS account no. 1ZA795. In the Trustee's

Complaint, the Trustee asserts New York Debtor and Creditor Law and federal fraudulent conveyance claims against the Defendants.

The Defendants filed their answer to the Complaint on or about December 14, 2011.

The Trustee filed an amended complaint on or about January 4, 2012 (the "Amended Complaint", which is sometimes referred to herein as the "Complaint").

To date, the Trustee and the Defendants have agreed to extend the time to answer the Amended Complaint up through and including April 30, 2012.

## ARGUMENT

## POINT I

## WITHDRAWAL OF THE REFERENCE IS MANDATORY WHERE SUBSTANTIAL CONSIDERATION IS REQUIRED OF BOTH THE BANKRUPTCY CODE AND OTHER FEDERAL LAWS

District courts have original jurisdiction over bankruptcy cases and all civil proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334. Pursuant to 28 U.S.C. § 157(a), the district court may refer actions within its bankruptcy jurisdiction to the bankruptcy judges of the district. A standing order issued in 1984 by then-Acting Chief Judge Ward automatically refers all such cases in this district to the bankruptcy court. See Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.), No. 04 Civ. 8177(RCC), 2004 U.S. Dist. LEXIS 23868, at *5-6 (S.D.N.Y. Nov. 22, 2004).

The reference, however, may be withdrawn. Section 157(d) of the Judicial Code provides for both mandatory and discretionary withdrawal of the reference:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section [28 U.S.C. § 157 (d)], on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d) (emphasis added).

The withdrawal of cases becomes mandatory when a litigant demonstrates that, "absent the withdrawal, the bankruptcy judge would be obliged 'to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statute.'" Picard vs. HSBC Bank PLC, 450 B.R. 406, 409 (S.D.N.Y. 2011)(citing City of New York vs. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991)); see also Shugrue vs. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc), 922 F.2d 984, 995 (2d Cir. 1990) (mandating withdrawal of a case involving "substantial and material consideration" of non-bankruptcy law). Pursuant to 28 U.S.C. 157(d), this Court must withdraw the reference in this case because the Trustee's claims against the Defendants raise significant issues of non-bankruptcy law. Id.; see also In re Chateaugay Corp., 86 B.R. 33, 36-39 (S.D.N.Y. 1987)(withdrawing the reference of a case involving core bankruptcy matters involving bankruptcy issues affecting ERISA law).

Since SIPA expressly provides that it is an amendment to the Securities Exchange Act of 1934, it is codified under Title 15 of the United States Code (where securities laws are placed), rather than in Title 11 (where bankruptcy laws are placed). Id. (quoting 28 U.S.C. § 157(d)); see Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 454 B.R. 307, 316 (S.D.N.Y. 2011)("[A]n issue that requires significant interpretation of SIPA undoubtedly requires consideration of laws other than Title 11. Regardless of a bankruptcy court's familiarity with a statute outside of Title 11, the requirements for mandatory withdrawal are satisfied if the proceeding requires consideration of a law outside of Title 11.").

Interpretation of federal securities law, specifically in the context of fraudulent conveyance claims in bankruptcy matters, requires mandatory withdrawal of the reference since the "adjudication of state-created private rights, such as the right to recover contract damages," must be determined by an Article III court. N. Pipeline Const. Co. v. Marathon Pipe Line Co.,

458 U.S. 50, 71, 102 S. Ct. 2858, 2871, 73 L. Ed. 2d 598 (1982); see also Stern v. Marshall, 131 S. Ct. 2594, 2614, 180 L. Ed. 2d 475 (2011) reh'g denied, 132 S. Ct. 56, 180 L. Ed. 2d 924 (U.S. 2011), (2011)(quoting Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 50, 109 S. Ct. 2782, 2794, 106 L. Ed. 2d 26 (1989)("[F]raudulent conveyance suits were 'quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res. As a consequence, we concluded that fraudulent conveyance actions were 'more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions.'"). In fact, "[t]he purpose of § 157(d) is to assure that an Article III judge decides issues calling for more than routine application of [federal laws] outside the Bankruptcy Code." Enron Power Mktg., Inc. v. Cal. Power Exch. Corp. (In re Enron Corp.), 2004 U.S. Dist. LEXIS 23868 (S.D.N.Y. Nov. 22, 2004); see also Bear, Stearns Sec. Corp. v. Gredd, 2001 U.S. Dist. LEXIS 10324 at *10 (S.D.N.Y. July 23, 2001)(holding a district court "need not evaluate the merits of the parties' positions," but instead determine whether the case will require a determination on "substantial and material consideration" of federal non-bankruptcy law); In re Cablevision S.A., 315 B.R. 818, 821 (S.D.N.Y. 2004)(mandating withdrawal when adjudication of the case required intermingled interpretation of federal securities laws and the Bankruptcy Code); In re Enron Corp., 388 B.R. 131, 140 (S.D.N.Y. 2008)(requiring withdrawal where the trustee's interpretation of the Bankruptcy Code involved substantial and material consideration of federal securities laws).

The Second Circuit has ruled that mandatory "[w]ithdrawal under 28 U.S.C. § 157(d) is not available merely whenever non-Bankruptcy Code federal statutes will be considered in the bankruptcy court proceeding, but is reserved for cases where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the

SXS/D809074v1/M057492/C0153850

proceeding." In re Ionosphere Clubs, Inc., 922 F.2d 984, 995 (2d Cir. 1990); see e.g., Picard v. Avellino et al., 2012 U.S. Dist. LEXIS 35260 (S.D.N.Y. February 29, 2012). In fact, in Picard v. Avellino et al., the reference was withdrawn in a Madoff Securities litigation adversary proceeding that raises issues identical to those discussed herein whereas the movants identified substantial and material consideration of non-Bankruptcy Code federal statutes. Id.; see also e.g., Picard v. Flinn Investments, LLC, 2011 U.S. Dist. LEXIS 136627 (S.D.N.Y.); Picard v. Katz, et al., 462 B.R. 447 (S.D.N.Y. 2011). As such, Mandatory withdrawal is required where the Bankruptcy Code conflicts with applicable federal laws. HSBC, 450 B.R. 406 (S.D.N.Y. 2011)(holding the conflict between SIPA and bankruptcy law as "something that itself warrants withdrawal of the bankruptcy reference."); In re Cablevision, 315 B.R. 818, 821 (S.D.N.Y. 2004)("The very existence of a dispute as to whether the rights of [investors] under the [Federal Acts] supersede [the Bankruptcy Code] or whether the Bankruptcy Code overrides the [Federal Acts], regardless of the ultimate resolution of such dispute, mandates withdrawal."); Gredd, 2001 U.S. Dist. LEXIS 10324 at *11 (holding that federal securities laws "arguably conflict[ed]" with the Bankruptcy Code which mandated withdrawal of the reference).

Here, there are many issues identified below that require "substantial and material consideration" of non-bankruptcy federal laws regulating organizations or activities affecting interstate commerce, including important unresolved issues under SIPA itself, a statute that has both bankruptcy and non-bankruptcy aspects and purposes. See In re Bernard L. Madoff Investment Securities, 654 F.3d 229, 235 (2d Cir. 2011)("SIPA serves dual purposes: to protect investors, and to protect the securities market as a whole."); Picard v. HSBC Bank PLC, 450 B.R. 406, 410 (S.D.N.Y. 2011). Consequently, withdrawal of the reference is mandatory.

## POINT II

## SIPA AND OTHER SECURITIES LAWS ALTER THE STANDARD THE TRUSTEE MUST MEET IN ORDER TO SHOW CAUSE THAT A DEFENDANTS DID NOT RECEIVE TRANSFERS IN GOOD FAITH UNDER 11 U.S.C. 548 (C)

Section 548 of the Bankruptcy Code and New York Debtor and Creditor law §§ 271–276 (incorporated by Section 544(b)(1) of the Bankruptcy Code) authorize a trustee to avoid transactions which have the purpose or effect of removing property from a debtor's estate, which should be used to repay creditors. 11 U.S.C. § 548; NY DCL, 271, et seq. (McKinney's 2011). Both the Bankruptcy Code and the DCL each contain provisions applying to the following two categories of transfers: (1) those made with "actual intent to hinder, delay, or defraud," and (2) those which, regardless of the debtor's intent, are constructively fraudulent because the debtor did not receive "reasonably equivalent value" (under Section 548) or "fair consideration" (under the DCL) in exchange for property transferred while insolvent. Id. Fraudulent transfers can be avoided if they occurred within 2 years of the bankruptcy filing under the Bankruptcy Code or six (6) years under applicable state law. See 11 U.S.C. § 548(a)(1), 11 U.S.C. § 544(b), N.Y. C.P.L.R. § 213(8) (McKinney's 2012).

Despite the inherent fraudulent nature of a Ponzi scheme, defendants sued by a trustee have the available defense provided in Section 548 (c) of the Bankruptcy Code, which provides that property conveyed to a transferee for value who acted in good faith is not recoverable. 11 U.S.C. § 548 (c). The parallel statute under the DCL provides, in pertinent part, that a conveyance can be recovered from any person "except a purchaser for fair consideration without having knowledge of the fraud at the time of the purchase. . .". NY DCL § 278 (McKinney's 2011).

SIPA and other securities laws alter the standard that the Trustee must meet in order to show that a defendant did not receive transfers in "good faith" under 11 U.S.C. 548(c). This

issue merits withdrawal of the reference. Indeed, because securities laws do not ordinarily impose a duty on investors to investigate their brokers, those laws foreclose any interpretation of "good faith" that creates liability for negligent failure to inquire. Picard v. Avellino et al., 2012 U.S. Dist. LEXIS 35260 (S.D.N.Y.). Consequently, the District Court has held that to establish a lack of "good faith" on the part of securities customers under Section 548(c) in the context of a SIPA bankruptcy, the Trustee must show that the customer either actually knew of the broker's fraud or willfully blinded himself from the fraud. Id. Such a standard is distinct from the applicable standard under a vanilla adversary proceeding in which a trustee in bankruptcy seeks to recover fraudulent transfers without the application or interpretation of SIPA. Certainly and as already decided by the Courts of this Circuit, determining whether the allegations in the Complaint plausibly suggest "willful blindness" requires substantial and material consideration of the securities laws. Id. at *11.

Indeed, here, the Defendants are being sued by the Trustee on the grounds that the Defendants, as unsophisticated investors, should have been able to uncover the largest Ponzi scheme in history, even though governmental and securities regulators were unable to do so. The Trustee seeks to retroactively impose duties that the Defendants would not have had at the time of the underlying events, which places the bankruptcy law in conflict with state and federal securities laws, for specifically, imposing a duty of inquiry on the Defendants that does not exist under securities laws. Based upon the unequivocal fact that there is substantial and material consideration of non-bankruptcy law, the Court should withdraw the reference from the Bankruptcy Court.

## POINT III

## WHETHER TRANSFERS MAY BE AVOIDED THAT SATISFIED ANTECEDENT DEBTS REQUIRES SIGNIFICANT INTERPRETATION OF SECURITIES LAWS

SIPA provides that "[w]henever customer property is not sufficient to pay in full [customer] claims . . . [t]he trustee may recover any property transferred by the debtor . . . ***to the extent that such transfer is voidable or void under the provisions of Title 11.*** " 15 U.S.C. § 78fff-2(c)(3)(emphasis added). The Trustee alleges that withdrawals made by the Defendants from his BLMIS accounts are avoidable as fraudulent transfers. However, this conflicts with federal securities laws providing that brokerage account statements create obligations owed by the broker to the customer, such that any payments thereon were in satisfaction of an antecedent debt, and not with a fraudulent intent or to defraud other creditors. 11 U.S. C. § 548(a)(1)(A); 11 U.S.C. § 548(c); N.Y. Debt. & Cred. Law § 276.

Courts have held that payment of an antecedent debt cannot constitute an intentional fraudulent conveyance. See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 54 (2d Cir. 2005). Likewise, authorities provide that payment of an antecedent debt constitutes a reasonably equivalent value or fair consideration as to alleged constructively fraudulent transfers under section 548(a)(1)(B) and New York's Debtor and Creditor Law, as well as "good faith" within the definition of New York's Debtor and Creditor Law. See 11 U.S.C. § 101(12); N.Y. Debt & Cred. Law § 272. Moreover, the satisfaction of a debt is also a defense to a fraudulent conveyance under Section 548(c) of the Bankruptcy Code. See 11 U.S.C. § 548(c).

### A. Brokerage Statements Create Enforceable Obligations

Since the 1970s, the securities market has operated through an indirect holding system whereby brokers hold securities for customers in "street name," such that customers no longer receive securities certificates to evidence their purchase. Instead, brokerage customers receive electronic brokerage account statements, which provide them rights of ownership regardless of whether the broker-dealer actually purchases the securities.

Federal securities regulations require broker-dealers to send customers account statements and trade confirmations. See 17 C.F.R. § 240.10b-10 (requiring broker-dealers to send customers trade confirmations). See also 17 C.F.R. § 240.17a-4(b)(4)(requiring broker-dealers to maintain all records of communications sent and received); 17 C.F.R. § 240.17a-4(c) (requiring broker-dealers to maintain records relating to customer accounts). Brokerage account statements are enforceable under the federal securities laws, even when the broker does not purchase the securities set forth thereon. See S.E.C. v. Zandford, 535 U.S. 813, 814, 122 S. Ct. 1899, 1900, 153 L. Ed. 2d 1 (2002)("[A] broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5."); see also In re J.P. Jeanneret Assocs., 769 F. Supp. 2d 340, 363 (S.D.N.Y. Jan. 31, 2011)(holding that a securities fraud claim arises "where the plaintiffs part with money intending that it be invested in securities, only to have the person to whom that money is entrusted steal it"); Nathel v. Siegal, 592 F. Supp. 2d 452, 463 (S.D.N.Y. 2008). The National Association of Securities Dealers and the New York Stock Exchange likewise require brokers to send their customers account statements. See NASD Rule 2340 (requiring broker-dealers to send customers account statement at least every quarter); NYSE Rule 409 (same).

These federal laws and regulations are consistent with state law ownership rights under UCC Article 8. Article 8 was enacted "to provide clarity and certainty regarding the rules that govern how interests in securities are evidenced and how they are transferred in the current securities market." NYUCC Art. 8 Historical and Statutory Notes. Section 8-501(b) of the NYUCC provides that "a person acquires a security entitlement if a securities intermediary. . . indicates by book entry that a financial asset has been credited to the person's security account, [or] becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account." NYUCC § 8-501(b). Section 8-501(c) provides that upon such book entry, "a person has a security entitlement *even though the securities intermediary does not itself hold the financial asset.*" NYUCC § 8-501(c)(emphasis added).

Recognizing that statements create obligations, SIPA advises customers of broker-dealers to look to their statements to ascertain what is owed to them:

> In the unlikely event your brokerage firm fails, you will need to prove that cash and/or securities are owed to you. This is easily done with a copy of your most recent statement and transaction records of the items bought or sold after the statement.

Understanding Your Brokerage Account Statements at 5, available at http://www.sipc.org/pdf/Broker_Statements_2_13.pdf (last accessed on June 21, 2011). The Trustee's claims against the Defendants are at total odds with the foregoing.

**B. The Trustee Cannot Avoid Payments in Satisfaction of an Antecedent Debt**

Under the foregoing laws, brokerage account statements create enforceable ownership rights against the broker, such that the amounts reported thereon are an "antecedent debt" that the broker owes to the customer. These rights are an antecedent "debt" under the Bankruptcy Code because they create "liability on a claim." 11 U.S.C. § 101(12).

It necessarily follows that a customer's account withdrawal is a satisfaction or partial satisfaction of this antecedent debt, and thus not a fraudulent conveyance. See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d 43, 54 (2d Cir. 2005) ("[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another."); Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 249 (2d Cir. 1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."); Pryor v. Fisher (In re Dimino), 429 B.R. 408, 417 (Bankr. E.D.N.Y. 2010)("In general, where a transfer is made to pay an antecedent debt, the transfer does not constitute a constructive fraudulent conveyance."); Pereira v. Equitable Life Ins. Soc'y of the United States (In re Trace Int'l Holdings, Inc.), 289 B.R. 548, 557 (Bankr. S.D.N.Y. 2003)("The payment of antecedent debts satisfies the definition of 'value' under the fraudulent conveyance laws, . . . and if reasonably or fairly equivalent to the transfer, will defeat the trustee's claim."). This is consistent with cases noting that "[u]nder SIPA and the case law construing it, a party who files a customer claim is considered a preferred *creditor* of the estate." Keller v. Blinder (In re Blinder, Robinson & Co.), 135 B.R. 892, 896 (D. Colo. 1991)(emphasis added)[1].

New York's Debtor and Creditor Law likewise recognize that a payment on an antecedent debt constitutes "fair consideration." See N.Y. Debt. & Cred. Law § 272 ("Fair

[1] Consistent with this, SIPA provides that "[a] trustee shall be vested with the same powers and title with respect to the debtor and the property of the debtor, including the same rights to avoid preferences, as a trustee in a case under title 11 of the United States Code." 15 U.S.C. § 78fff-1(a). SIPA's emphasis on preferences, rather than fraudulent conveyances, is significant because the Trustee may avoid payments on an antecedent debt only when they are preferences -- not fraudulent conveyances. See Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.), 323 B.R. 838, 842 (Bankr. S.D.N.Y. 2005) (discussing cases noting that "a preferential transfer that satisfied an antecedent debt could not be deemed to be a fraudulent conveyance because the existence of the antecedent debt satisfied the requirement of reasonably equivalent value or fair consideration."). As such, Section 78fff- 1(a) is an implicit acknowledgment that customers under SIPA are creditors owed an antecedent debt against whom the Trustee may avoid preferences, but not fraudulent conveyances.

consideration is given for property . . . [w]hen in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed ***or an antecedent debt is satisfied*** . . . . ")(emphasis added).

Based on the foregoing, the Defendants' BLMIS account withdrawals were in partial satisfaction of the antecedent debt BLMIS owed to them. As such, the withdrawals were not made to defraud and are not "voidable or void" under SIPA. See 15 U.S.C. § 78fff-2(c)(3). More importantly, the Court considered this issue at length in Picard v. Flinn and concluded that resolution of the issue requires significant interpretation of securities law and therefore, merits withdrawal. 2011 U.S. Dist. LEXIS 136627 (S.D.N.Y.)(holding that the difficult issue presented requires an undertaking of significant interpretation of securities law to resolve it); see also, Picard v. Avellino et al., 2012 U.S. Dist. LEXIS 35260 (S.D.N.Y.)(holding to withdraw the reference to determine whether the Trustee may, consistent with non-bankruptcy law, avoid transfers that Madoff Securities purportedly made in order to satisfy antecedent debts). As this argument requires significant analysis of how the Bankruptcy Code's avoidance provisions interact with SIPA and other federal securities laws, withdrawal of the reference is mandatory.

## POINT IV

## RESOLVING THE ISSUE OF WHETHER SECTION 546(e) OF THE BANKRUPTCY CODE APPLIES REQUIRES SUBSTANTIAL AND MATERIAL CONSIDERATION OF NON-BANKRUPTCY LAW MANDATING WITHDRAWAL OF THE REFERENCE

In the case of the bankruptcy of Madoff Securities, fundamental avoidance principles under the Bankruptcy Code and applicable state law are affected by several distinct characteristics. Picard v. Katz, et al., 462 B.R. 447 (S.D.N.Y. 2011). To begin with, Madoff Securities was a registered securities brokerage firm, a fact that directly invokes certain 546(e) or the "safe harbor" provisions of the Bankruptcy Code, permits the appointment of a SIPA Trustee, and indirectly implicates certain principles of the securities laws. Id. In addition, Madoff and

Madoff Securities were, at all times here relevant, engaged in a fraudulent "Ponzi scheme," by which customers of Madoff Securities were led to believe that their monies were being invested in profitable securities transactions, but instead, were paid profits from new monies received from other customers, without any actual securities trades taking place. Id.

In Katz, the Court determined that because Madoff Securities was a registered stockbrokerage firm, the liabilities of customers are subject to the "safe harbor" set forth in section 546(e) of the Bankruptcy Code. Id. Importantly, "[b]y restricting a bankruptcy trustee's power to recover payments that are otherwise avoidable under the Bankruptcy Code, the safe harbor stands 'at the intersection of two important national legislative policies on a collision course - the policies of bankruptcy and securities law.'" Id. (citing In re Enron Creditors Recovery Corp., 651 F.3d 329, 334 (2d Cir. June 28, 2011)(quoting In Re Resorts Int'l, Inc., 181 F.3d 505, 515 (3d Cir. 1999)).

Specifically, section 546(e) of the Bankruptcy Code provides as follows:

> [N]otwithstanding sections 544, 545, 547, 548(a)(1)(B) and 548(b) of this title, ***the trustee may not avoid*** a transfer that is a . . . or settlement payment, as defined in section . . . 741 of this title, made by or to (or for the benefit of) a . . . stockbroker . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker, in connection with a securities contract, as defined in section 741(7). . . except under section 548(a)(1)(A) of this title.

11 U.S.C § 546(e).

In essence the foregoing safe harbor provision prohibits a bankruptcy trustee from employing all the Bankruptcy Code sections for preferences and constructive fraud and, all applicable sections of New York State law dealing with actual fraud. For purposes of this Motion, however, Defendants need not argue the merits of whether the safe harbor provision applies, but they merely need to point out that determining whether Section 546(e) applies, depends on how a Court resolves numerous questions of securities laws.

SXS/D809074v1/M057492/C0153850

The Second Circuit has held that § 546(e) applies where: (i) a transfer completes a securities transactions; and (ii) the completion of a securities transaction need not involve a "purchase or sale of securities." Picard v. Flinn Investments, LLC, 2011 U.S. Dist. LEXIS 136627 at *18 (S.D.N.Y.)(citation omitted). Thus, to determine whether § 546(e) applies to the Adversary Proceeding, a court must determine, among other things, whether transfers from Madoff Securities completed securities transactions even though Madoff Securities never purchased or sold securities on behalf of the Defendants. "The Bankruptcy Code provides little guidance on such a question, and a court must undertake 'significant interpretation' of securities law in order to resolve it." Id. at *18-19. Similarly, the Court must decide novel issues of interpretation of the phrases contained in Section 546(e) such as "in connection with" when discussing securities contracts. This phrase is not defined in the Bankruptcy Code, but commonly and frequently interpreted, in securities laws. Id. As such, deciphering the meaning under Section 546(e) requires significant interpretation of securities law. Accordingly, the Court should withdraw the reference to the bankruptcy court to resolve issues surrounding the application of § 546(e) in this clawback action relating to Madoff's fraud.

## POINT V

## PROVISIONS OF THE INTERNAL REVENUE CODE EFFECTIVELY REQUIRE WITHDRAWALS FROM PENSION PLANS AND THEREFORE PREVENT THE TRUSTEE FROM AVOIDING THE REQUIRED WITHDRAWALS AS FRAUDULENT

The Defendants are a pension plan and the trustees of that pension plan. Any withdrawals taken from the pension plan prevent the Trustee from avoiding required withdrawals as fraudulent because the Internal Revenue Code ***required*** minimum distributions or else be subject to certain penalties. The Court similarly decided this issue in Picard v. Flinn, wherein mandated withdrawals from an IRA pursuant to the Internal Revenue Code required significant interpretation of the Internal Revenue Code (i.e., non-bankruptcy law) and therefore, withdrawal

SXS/D809074v1/M057492/C0153850

of the reference was sufficient. 2011 U.S. Dist. 136627 (S.D.N.Y.). Likewise, based upon the fact that this issue requires significant interpretation of the Internal Revenue Code for required withdrawals from a pension plan, the Court must withdraw the reference.

## POINT VI

## POST STERN, BANKRUPTCY COURTS CANNOT ENTER A FINAL JUDGMENT WITHOUT USURPING THE JUDICIAL POWER RESERVED FOR ARTICLE III COURTS WHICH RAISES SERIOUS CONSTITUTIONAL ISSUES

Withdrawal of the reference is also warranted because, in light of the Supreme Court's recent decision in Stern v. Marshall, there is now a serious question as to whether the Bankruptcy Court can constitutionally decide this Adversary Proceeding. 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011) reh'g denied, 132 S. Ct. 56, 180 L. Ed. 2d 924 (U.S. 2011). Indeed, resolution of such actions requires an exercise of the judicial power reserved for Article III Courts.

In Stern, the Supreme Court held that a counterclaim asserted by Vickie Marshall as debtor in possession was a core claim as defined in 28 U.S.C. § 157(b)(2) because it came within the category enumerated in section 157(b)(2)(C), "counterclaims by the estate against persons filing claims against the estate." Id. at 2604. The Court nonetheless held that permitting a bankruptcy court to "hear and determine" the counterclaim would violate Article III of the Constitution because a bankruptcy court is not an Article III court and the counterclaim did not involve a "public right" that may be adjudicated by a non-Article III court. The Court held that the assertion of core jurisdiction under section 157(b)(2)(C), although in accord with the statute, was unconstitutional because the debtor's "claim is a state law action independent of the federal bankruptcy law and not necessarily resolved by a ruling on the creditor's proof of claim in bankruptcy." Id. at 2611.

In Stern, the Supreme Court also implied that fraudulent conveyance claims like those asserted in the Complaint may not be heard by a Bankruptcy Court, citing Granfinanciera and

the distinction between public and private rights that it had used in holding that the grant of jurisdiction to non-Article III courts under the 1978 Bankruptcy Reform Act was unconstitutional in N. Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 73-76, 102 S. Ct. 2858, 73 L. Ed. 2d 598 (1982). See Granfinanciera, 492 U.S. at 53 (citing Northern Pipeline). Although the Court declined to rule on whether fraudulent conveyance claims could be decided by a non-Article III court in Granfinanciera, the Court relied on the decision as demonstrating the nature of the claims that may not be decided by a non-Article III court.

In explaining why Vickie Marshall's counterclaim could not be decided by a non-Article III court, Chief Justice Roberts explained:

> In Granfinanciera we rejected a bankruptcy trustee's argument that a fraudulent conveyance action filed on behalf of a bankruptcy estate against a noncreditor in a bankruptcy proceeding fell within the "public rights" exception. We explained that, "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court." Id. at 54-55. We reasoned that fraudulent conveyance suits were "quintessentially suits at common law that more nearly resemble state law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." Id. at 56. As a consequence, we concluded that fraudulent conveyance actions were "more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions." Id. at 55.
>
> Vickie's counterclaim—like the fraudulent conveyance claim at issue in Granfinanciera—does not fall within any of the varied formulations of the public rights exception in this Court's cases.

Id. at 2614.

"Against this background, the Supreme Court held in Stern v. Marshall that Congress improperly vested judicial power in a non-Article III judge when it allowed bankruptcy courts 'to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on

a creditor's proof of claim.'". Picard v. Flinn Investments, LLC et al., 2011 U.S. Dist. LEXIS 136627 at *22 (S.D.N.Y.). The Court's recognition that the distinction between public and private rights that it applied in Granfinanciera is determinative of whether a case can be decided by a bankruptcy court supports the conclusion that this entire Adversary Proceeding should be heard by the District Court. While the full import of the Stern decision is the subject of significant debate among Constitutional and bankruptcy scholars, the presumption in favor of Article III courts clearly articulated by the majority in Stern weighs heavily in favor of immediate withdrawal of the reference of this Adversary Proceeding to the District Court for all purposes.

Indeed, all of the claims asserted against the Defendants are precisely the types of claims for which the Bankruptcy Court lacks constitutional authority to enter judgments. Fraudulent transfer claims are "core proceedings" (28 U.S.C. § 157(b)(2)(H)), and they are "quintessentially suits at common law," not subject to the public rights exception. See Stern, 131 S.Ct. 2594; Granfinanciera, 492 U.S. at 56. More importantly, resolution of this argument requires significant interpretation of both Article III and the Supreme Court precedent analyzing it, which mandates withdrawal of the reference. See e.g., Picard v. Flinn, 2011 U.S. Dist. LEXIS 136627 (S.D.N.Y.); Picard v. Avellino, 2012 U.S. Dist. LEXIS 35260 (S.D.N.Y.). For these reasons, the Court should grant the Withdrawal Motion.

## POINT VII

## THIS ACTION IS SUBJECT TO WITHDRAWAL OF THE REFERENCE FOR CAUSE

The reference to the bankruptcy court should be withdrawn "for cause" under 28 U.S.C. § 157(d). The Second Circuit has held that, in determining whether to withdraw the reference "for cause," a district court may consider a number of factors including whether the parties have a right to a jury trial and judicial efficiency. Orion Pictures Corp. v. Showtime Networks, Inc. (In

re Orion Pictures Corp.), 4 F.3d 1095, 1101 (2d Cir. 1993); see also e.g., M. Fabrikant & Sons, Inc. v. Long's Jeweler's Ltd., 2008 U.S. Dist. LEXIS 50247 at *9 (S.D.N.Y. June 26, 2008)("absent additional considerations, withdrawing the reference is efficient" where "a party is entitled to a jury trial."); In re Wedtech Corp., 94 B.R. 293, 296 (S.D.N.Y 1988)(efficiency and jury trial considerations are relevant to "cause" determination).

The reference should be withdrawn "for cause" because the Bankruptcy Court cannot conduct a jury trial nor can it issue a final judgment on the claims asserted against the Defendants.

### A. The Defendants Have a Right to a Jury Trial on All of the Claims in the Complaint

The Defendants have a right to a jury trial on all of the Trustee's claims against them, which cannot be conducted by the Bankruptcy Court. Indeed, Defendants do not consent to a jury trial conducted by the Bankruptcy Court. As they do not nor will they consent to a jury trial in the Bankruptcy Court, the Defendants are therefore entitled to a jury trial in the District Court. The Defendants have every intention of demanding a jury trial in an answer to the Amended Complaint to be filed in this Adversary Proceeding. This right provides cause for withdrawal of the reference.

### B. Judicial Economy and Uniformity Require Withdrawal of the Reference

The core verses non-core nature of the proceedings is not dispositive of the determination whether to withdraw the reference. Northwest Airlines, Inc. v. Los Angeles (In re Northwest Airlines Corp.), 384 B.R. 51 (S.D.N.Y. 2008). Questions of the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors bear on the determination to withdraw the reference. See Orion, 4 F.3d at 1101; Complete Management, Inc. v. Arthur Andersen, LLP (In re

Complete Management, Inc.), 2002 U.S. Dist. LEXIS 18344, *11-12 (S.D.N.Y. 2002) ("even assuming that the Andersen adversary proceeding is technically a core proceeding, we find that the other factors to be considered favor the discretionary withdrawal of the adversary proceeding"). Economical use of judicial resources and the interests of uniformity are best accomplished through the withdrawal of the reference of the Trustee Action.

Importantly, as discussed above, infra, post Stern, it is questionable whether the Bankruptcy Court can issue a final judgment against the Defendants on any of the claims asserted in the Complaint. Stern, 131 S. Ct. 2594. The Bankruptcy Court would thus be limited to issuing proposed findings of fact and conclusions of law to the District Court, for that court's review and issuance of a final judgment. See Id. at 2597-98. This would only serve to delay the entry of a final judgment and potentially provide adjudication before more than one court – the Bankruptcy Court in deciding proposed findings and conclusions of law and the District Court in entering final judgments. This in no way promotes judicial efficiency. The immediate withdrawal will enable the District Court to become familiar with the relevant facts and law prior to trial. Likewise, assignment to a District Court Judge early in the case will allow for the District Court procedures to be implemented, such as, inter alia, scheduling conferences, executing scheduling Orders and providing for pre-motion conferences. This would promote uniformity and efficiency for this action. Accordingly, concerns such as efficiency and the need for a jury also favor withdrawal from the Bankruptcy Court.

## CONCLUSION

For all of the foregoing reasons, the Defendants respectfully request that the District Court enter an Order withdrawing the reference of the Adversary Proceeding from the Bankruptcy Court.

Dated: Garden City, New York
March 30, 2012

JASPAN SCHLESINGER LLP
*Attorneys for The LDP Corp. Profit Sharing Plan And Trust; Leonard D. Pearlman, in his capacity As Trustee for The LDP Corp. Profit Sharing Plan and Trust; and Emanuel R. Pearlman, in his capacity as Trustee for The LDP Corp. Profit Sharing Plan and Trust*

By: *s/ Steven R. Schlesinger*
STEVEN R. SCHLESINGER, ESQ.
SHANNON ANNE SCOTT, ESQ.
300 Garden City Plaza
Garden City, New York 11530
(516) 746-8000

SXS/D809074v1/M057492/C0153850